UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 08-11935-RGS

PATRICIA A. HUMPHREY

v.

MICHAEL J. ASTRUE, COMMISSIONER
SOCIAL SECURITY ADMINISTRATION

MEMORANDUM AND ORDER ON
APPELLANT'S MOTION TO REVERSE OR REMAND
AND APPELLEE'S MOTION TO AFFIRM
THE DECISION OF THE COMMISSIONER

December 29, 2009

STEARNS, D.J.

Patricia Humphrey seeks review of a final decision of the Commissioner of Social Security that she is not disabled as defined by the implementing regulations of the Social Security Act (Act). See 20 C.F.R. § 404.1520(f). The Commissioner determined that while Humphrey is unable to resume her prior occupations as a hotel housekeeper, grocery bagger, or sales attendant, she is able to perform less physically demanding work. The issue on appeal is whether substantial evidence supports the May 23, 2008 decision of the Commissioner. Humphrey sought review of the Commissioner's decision in the district court pursuant to 42 U.S.C. § 405(g), after her benefits application, motion for reconsideration, and request for review by the Appeals Council were successively denied.[1] At Humphrey's request, no hearing was scheduled by this court on her appeal. Because the Commissioner's decision is supported by substantial evidence, it will be affirmed.

---

[1] A denial of review by the Appeals Council has the effect of adopting the decision of the Administrative Law Judge (ALJ) as that of the Commissioner. See 20 C.F.R. §§ 404.955, 404.98.

BACKGROUND

In June of 2006, Humphrey filed an application for Disability Insurance Benefits, alleging a permanent disability as of July 24, 2005, stemming from a combination of lower back strain, headaches, anxiety, and depression. On April 10, 2008, ALJ Stephen C. Fulton heard testimony from Humphrey (who was represented by counsel), and from Jeff Goldfarb, a vocational expert (VE). On May 23, 2008, the ALJ issued a written decision in which he found that Humphrey could perform "light work as defined in 20 C.F.R. 404.1567(b) and 516.967(b), except that [she] may only occasionally climb using a rope, ladder, or scaffold." Trial Record (Tr.) at 13.

On the date of the decision, Humphrey was forty-eight years old. She is a high school graduate. She lives with her boyfriend of twenty-six years and the youngest of her two children. Humphrey has been employed as a department store clerk, a grocery bagger, and for the eight years prior to July 24, 2005, as a hotel housekeeper. She injured her back while at work on July 24, 2005, and has not worked since.

The Medical Evidence

Humphrey presented at Marlborough Hospital on July 27, 2005, complaining of mid- and lower-back pain. X-rays taken that day showed minimal spurring and no evidence of a fracture. On August 6, 2005, she complained of mid-back pain to Dr. Steven First, her primary care physician. Dr. First diagnosed Humphrey with chronic back strain for which he prescribed medication and physical therapy. Believing that Humphrey "[d]oes heavy work," he told her to stay home and rest for three weeks. Tr. at 191. Less than two weeks later, on August 19, 2005, Humphrey returned to Dr. First complaining of persisting lower back pain and seeking a "note for disability." She had yet to begin physical therapy. Dr.

First again prescribed physical therapy and told Humphrey to stay out of work for two more weeks. When Humphrey returned to Dr. First on September 15, 2005, still complaining of pain, he ordered an MRI of her thoracic spine. After reviewing the MRI results, Dr. First opined that Humphrey was "indefinitely disabled from doing the work she does." Tr. at 190.

On October 6, 2005, Humphrey was evaluated by Dr. William Donahue in conjunction with her workers' compensation claim. He concluded that her x-rays and MRIs were "normal except for pre-existing arthritis of the thoracic spine." Tr. at 160. Dr. Donahue diagnosed Humphrey with chronic thoracic strain and pre-existing mild arthritis of the thoracic spine. He found her to be "pleasant and cooperative." Id. Although he determined that she had "some subjective symptoms," he opined she had "little in the way of objective findings to support a significant ongoing disability." Id.

Humphrey returned to Dr. First on January 11, 2006, complaining that the pain had spread from her lower back into both arms. An MRI of her lumbar spine, conducted on January 24, 2006, was "negative." Tr. at 302. Dr. First completed an Emergency Aid to the Elderly, Disabled and Children (EAEDC) report on March 25, 2006, in which he diagnosed Humphrey as having "degenerative disc disease of thoracic spine (possibly from doing heavy physical work)." Tr. at 194. His prescribed treatment plan was for her to "change jobs." Tr. at 195. He opined that she could only stand, walk, or sit for short periods, that she had a minimal ability to stoop or bend, and that she could not lift more than ten pounds. He noted no deficits in Humphrey's mental functioning.

During the summer of 2006, the Massachusetts Rehabilitation Commission's Disability Determination Service (DDS) referred Humphrey for consultative physical and mental examinations. Dr. Felix Mayers saw Humphrey for a physical assessment on July

25, 2006. Humphrey reported headaches over the previous two months and continuing back pain. Dr. Mayers diagnosed Humphrey's headaches as mild and responsive to over-the-counter analgesics. He also found "[s]ome minimal limitation in range of motion of the spine." Tr. at 201. As Humphrey had related her daughter's observation that she might be depressed, DDS arranged a psychiatric evaluation. Richard Stellar, Ed.D., saw Humphrey for a mental assessment on August 3, 2006. He reported that Humphrey "does not feel she has an underlying or major depression," a self-diagnosis with which he "certainly" agreed. "She does get up everyday, dresses, and takes care of herself." Tr. at 205. Stellar concluded:

> I see no evidence of psychotic thought process and [Humphrey] relates appropriately, but her presentation coupled with brief evaluation suggests she is probably of borderline intelligence.
> . . . .
> She shows some ability to think abstractly, has a relatively small fund of general knowledge, and trouble doing arithmetic problems and should be assisted in managing funds.
> [She] feels quite impaired by her back problems.
> I do think [she] should be assisted in managing funds.

Tr. at 206-207.

On August 22, 2006, Dr. Barbara Trockman completed a Residual Functional Capacity (RFC) assessment of Humphrey. Dr. Trockman found that Humphrey could: (1) frequently lift up to ten pounds; (2) occasionally lift up to twenty pounds; (3) stand, walk, or sit for up to six hours in an eight-hour workday; and (4) occasionally climb, balance, stoop, kneel, crouch, and crawl.

From October 25, 2006, through July 16, 2007, Humphrey sought therapy for "depressed mood with tearfulness" at Advocates Community Counsel. Tr. at 289. On her

4

intake form, she denied being unable to function at work, school, or parenting. She also denied having symptoms of anxiety or psychosis. Humphrey was diagnosed with depressive disorder not otherwise specified. On November 15, 2006 (the first session for which notes appear in the record), she reported fewer depression symptoms and said that when she was upset or tearful she would go for a walk rather than isolate herself in her room. At a follow-up appointment, she reported having stayed with her regimen of physical exercise (walking) to cope with bouts of depression and tearfulness. She expressed a wish to return to work as she thought that the lack of daily structure was causing her sleep difficulties, but felt that she could not do so because of her physical limitations – she "couldn't lift." Tr. at 282. On December 6, 2006, Dawn Brock, Humphrey's clinician, wrote that it was "still not clear if [Humphrey] truly suffers from depression . . . ." Tr. at 279. On January 17, 2007, Brock noted that Humphrey "reported that she enjoys more day activities and exercise when she initially thought she would experience physical discomfort and feeling overwhelmed." Tr. at 277. Humphrey reported increased mood stability and stated that she had not cried in several weeks or felt the urge to sleep during the day. She attributed her elevated mood to the increase in her daily activity. She continued to exercise and by March 28, 2007, reported that she was walking every day doing errands, visiting friends, and walking her dog.

Humphrey began treatment at Framingham Orthopedic Associates on January 22, 2007, under the care of Dr. Neil Herman. On her intake form, she denied any stiffness, popping noises, joint pain, weakness, limitation of movement, or difficulty walking. She also disclaimed any psychiatric disorders, but did report mood swings. On April 10, 2007, Dr. Herman evaluated Humphrey and reviewed her x-rays and the MRI ordered in March by

Dr. First. Dr. Herman's evaluation "reveals a woman in no obvious distress." Tr. at 333. He noted the x-rays "reveal minimal degenerative change" and that the MRI "shows some degenerative change and disc bulging without any significant neural impingement." Id. Humphrey stated that she had derived no benefit from the physical therapy, although she had attended only four sessions. Dr. Herman explained to her that "physical therapy is still the treatment of choice for [her pain]." Id.

At a therapy session on April 18, 2007, Clinician Brock attempted to engage Humphrey in a discussion about her compliance with her medical prescriptions. Brock had learned that Humphrey's last pharmacy refill had been on November 19, 2006, for a thirty-day supply of a 20 mg dose of Paxil while Dr. First's most recent prescription had been for a 30 mg dose. Humphrey stated that she did not want the higher dose and that "sometimes I forget to take [Paxil]." Tr. at 267. She refused to engage Brock further. Brock noted that Humphrey "refrained from speaking for most of the session or was vague in her responses, particularly with regards to SSDI claim discussion." Id.

Also on April 18, 2007, Brock completed a psychiatric disorder questionnaire in which she assigned Humphrey a Global Assessment of Functioning (GAF) score of 65.[2] Brock observed that Humphrey "seems to function adaptively in her environment, at times she reports lack of day structure [has a] negative impact on her mood . . . her environment may have a greater impact on her mood than her mood has upon her ability to function

---

[2]The GAF is a numeric scale (0 through 100) used by mental health clinicians and physicians to subjectively rate the social, occupational, and psychological functioning of adults. The GAF score range between 61 and 70 is described as "some mild symptoms . . . OR some difficulty in social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." See AMERICAN PSYCHIATRIC ASS'N, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS (4th ed., text rev. 2000) ("DSM-IV-TR") at 34.

within her environment." Tr. at 231. She also noted that Humphrey reported no deficits in concentration or attention, and opined that she could concentrate for extended periods of time without distraction by psychologically based symptoms or external stimuli. Brock described Humphrey's prognosis as "very favorable if [she] follows medication and treatment regimes."[3] Tr. at 233.

Humphrey was involved in a minor motor vehicle accident on or about May 8, 2007. Dr. Jonathan Arnow reviewed x-rays of her cervical spine taken two days after the accident and found they showed "degenerative disc disease at C3-4," but were "otherwise unremarkable." Tr. at 321.

A second physical RFC assessment was completed on May 24, 2007 by Dr. William Straub. His assessment was identical to the one Dr. Trockman recorded on August 22, 2006, with one exception: Dr. Straub found that Humphrey could balance and climb ramps or stairs "frequently" rather than only "occasionally."

On September 17, 2007, Social Worker Riley, completed a Mental Impairment Questionnaire in which she assigned Humphrey a GAF of 45.[4] Riley opined that Humphrey had great difficulty concentrating, that she suffered from major depressive episodes, and that she would require extended treatment. She noted that "[a]lthough I have not worked

---

[3]Brock's last session with Humphrey was on May 9, 2007, after which Humphrey continued treatment with Debora Riley, a social worker. When Brock and Humphrey discussed the upcoming transition, Humphrey alerted Brock to a "possible scheduling conflict with [the] new therapist, due to taking care of a grandchild on Mondays. . . ." Tr. at 264.

[4]The GAF score range between 41 and 50 is described as "serious symptoms . . . OR any serious impairment in social, occupational, or school functioning." DSM-IV-TR at 34.

for an extensive period of time with this client, it does appear that she may emphasize somatic pains rather than discussing any sad feelings she may have." Tr. at 357.

Dr. Herman met with Humphrey on December 19, 2007. His notes indicate that they had "gone over a functional capacity questionnaire." Tr. at 332. He reported that

> [s]he doesn't feel she can sit for more than an hour at a time and can't stand for more than 45 minutes at a time. In an eight hour day she can walk less than two hours and she can sit for a total of about two hours. She would also require walking periods every 60 minutes or so and needs to walk for about 10 minutes. She cannot do lifting more than 5 lbs. and this would be quite occasional as well as be limited in twisting and bending.

Tr. at 332. The questionnaire mirrored the physical limitations reflected in Dr. Herman's notes, adding that: (1) Humphrey's pain is never severe enough to interfere with attention and concentration; (2) she has no significant limitations in doing repetitive reaching, handling, or fingering; and (3) she can occasionally lift weights of less than ten pounds. Humphrey testified at the April 10, 2008 hearing before the ALJ that she suffers from back and neck pain and depression and had last sought treatment the previous November. She said that she had been taking pain medication but that "the medicine ran out." Tr. at 38. She stated that she could lift a gallon of milk, that her depression was controlled by her medication, and that she saw her therapist every two weeks.

### The ALJ's Decision

ALJ Fulton made the following pertinent written findings.

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2010.

2. The claimant has not engaged in substantial gainful activity since July 24, 2005, the alleged onset date (20 CFR 404.1520(b), 404.1571 *et seq.*, 416.920(b) and 416.971 *et seq.*).

3. [sic]

8

4. The claimant has the following severe impairments: back pain, neck pain, depression and anxiety (20 CFR 404.1520(c) and 416.920(c)).

5. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P. Appendix 1 (20 CFR 404.1520(d), 404.1525, 416.920(d), 416.925 and 416.926).

6. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except the claimant may only occasionally climb using a rope, ladder, or scaffold. She may occasionally stoop, kneel, crouch and crawl. The claimant is able to understand and remember simple instructions and can concentrate for 2-hour periods over an 8-hour workday on simple tasks. She is able to interact appropriately with co-workers and supervisors and can adapt to changes in the work setting.

7. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

8. The claimant was born on April 12, 1960 and was 45 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

9. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564 and 416.964).

10. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404.1568 and 416.968).

11. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1560(c), 404.1566, 416.960(c), and 416.966).

12. The claimant has not been under a disability, as defined in the Social Security Act, from July 24, 2005 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

Tr. at 11-21.

## DISCUSSION

9

Disability determinations follow the "sequential step analysis" mandated by 20 C.F.R. § 404.1520. The ALJ must first determine whether a claimant was gainfully employed prior to the onset of the disabling condition. The ALJ must then determine whether the claimant suffers from a severe impairment limiting her ability to work. If the impairment is the same as, or equal in its effect to, an impairment (or combination of impairments) listed in Appendix 1 of Subpart P of the regulations, the claimant is presumed disabled. If the impairment is not covered by Appendix 1, the fourth step of the analysis requires that the claimant prove her disability is sufficiently serious to preclude a return to her former occupation. See Goodermote v. Sec'y of Health and Human Servs., 690 F.2d 5, 6-7 (1st Cir. 1982). Only if she meets that burden is the Commissioner at the fifth step obligated to prove that there are other jobs in the national economy that she could nonetheless perform. See Gonzalez Perez v. Sec'y of Health, Educ. and Welfare, 572 F.2d 886, 888 (1st Cir. 1978).

The findings of the Commissioner are conclusive so long as they are supported by substantial evidence and so long as the Commissioner has applied the correct legal standard. See 42 U.S.C. § 405(g); Manso-Pizarro v. Sec'y of Health and Human Servs., 76 F.3d 15, 16 (1st Cir. 1996). "Substantial evidence . . . means evidence reasonably sufficient to support a conclusion. Sufficiency, of course, does not disappear merely by reason of contradictory evidence. . . . [The] question [is] not which side [the court] believe[s] is right, but whether [the ALJ] had substantial evidentiary grounds for a reasonable decision . . . ." Doyle v. Paul Revere Life Ins. Co., 144 F.3d 181, 184 (1st Cir. 1998). The Commissioner's findings "are not conclusive when derived by ignoring evidence,

misapplying the law, or judging matters entrusted to experts." Nguyen v. Chater, 172 F.3d 31, 35 (1st Cir. 1999) (per curiam).

The ALJ found at Step 1 and 2 of the sequential step analysis that Humphrey had not been engaged in substantial gainful activity since July 24, 2005, and that she suffered from the following severe impairments: back pain, neck pain, depression, and anxiety. However, at Step 3, the ALJ found that these severe impairments, even in combination, did not meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Steps 4 and 5 of the analysis require an assessment of a claimant's residual functional capacity (RFC). See 20 C.F.R. § 404.1545. The ALJ found at Step 4 that Humphrey lacked the capacity to return to any of her previous occupations. At Step 5, however, he found she was capable of performing light work within limits. On appeal, Humphrey asserts the ALJ erred in his RFC assessment at Step 5 by failing to give controlling or considerable weight to the assessment of Dr. Herman, her orthopedist.

Under SSA regulations, an ALJ is ordinarily to give "more weight" to treating physicians' opinions, "since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations." 20 C.F.R. § 404.1527(d)(2). That being said, the ALJ is not required to give a treating physician's opinion controlling weight. See Arroyo v. Sec'y of Health and Human Servs., 932 F.2d 82, 89 (1st Cir. 1991); Rodriguez Pagan v. Sec'y of Health and Human Servs., 819 F.2d 1, 4 (1st Cir. 1987). If the treating physician's opinion is inconsistent with other evidence in the

record, the conflict is for the Commissioner – and not the court – to resolve. See Rodriguez v. Sec'y of Health and Human Servs., 647 F.2d 218, 222 (1st Cir. 1981).

Here, the ALJ had good reason to discount Dr. Herman's physical RFC assessment for the reason he stated: that the evidence "suggests that Dr. Herman's assessment of [Humphrey's] functional abilities [was] based exclusively on [Humphrey's] own assessment of her capacities." Tr. at 18. Moreover, the assessment was at odds with the consistent findings of both Drs. Trockman and Straub, which the ALJ credited (along with Brock's psychiatric disorder questionnaire). Moreover, these latter assessments (as the ALJ noted) were not inconsistent with Humphrey's self-reported activities. There is no indication in the record that the ALJ disregarded Dr. Herman's opinion. Rather, the record shows that ALJ carefully weighed the opinions of *all* of the medical experts, in addition to Humphrey's work history, medical records, and her personal testimony, in reaching his ultimate conclusions.

The same is true of the ALJ's finding that jobs which Humphrey is able to perform exist in significant numbers in the Massachusetts and national economies. He presented two hypothetical claimants to the vocational expert (VE) at the hearing. The two hypothetical claimants matched Humphrey's age, education, and experience, but differed in levels of impairment. The first hypothetical claimant (Claimant 1), was posited to be impaired in a manner consistent with the RFCs of Drs. Trockman and Straub, as capable of performing work at the light exertional level with only occasional climbing using a rope, ladder, or scaffold and only occasionally stooping, kneeling, crouching, or crawling. The VE testified that Claimant 1 could find work as a sales attendant, small parts assembler, or cashier. The second hypothetical claimant (Claimant 2), was posited to be impaired in a manner consistent with the assessment reported by Dr. Herman, as requiring

unscheduled breaks totaling one hour in an eight-hour day and likely absences from work twice each month. The VE testified that no suitable employment existed in significant numbers in the regional or national economy for Claimant 2. The ALJ found that Humphrey more resembled Claimant 1 than Claimant 2. He noted that: (1) Humphrey reported taking walks and caring for her grandson; (2) she reported walking sufficient distances to perform errands, visit friends, and exercise her dog; (3) she had not been prescribed medication for her back and neck pain for five months; (4) she denied depression or any other underlying mental condition and instead merely described feeling "down" at times; (5) her therapists consistently described her as pleasant and easily engaged; and (6) it is unclear whether she is compliant with her psychiatric medication. The ALJ's conclusion was based on the whole record, including the objective medical records, the opinions of treating and reviewing doctors and therapists, and Humphrey's self-reports and testimony. As the weight of the evidence lends substantial support to the ALJ's decision, it will be affirmed.

## ORDER

For the foregoing reasons, Humphrey's motion to set aside or remand is <u>DENIED</u>. The Commissioner's cross-motion for an order of affirmance is <u>ALLOWED</u>. The Clerk will enter judgment affirming the decision of the Commissioner and close the case.

                    SO ORDERED.

                    /s/ Richard G. Stearns

                    _____
                    UNITED STATES DISTRICT JUDGE